88 F.3d 77
 ROBERT PASHAIAN, Plaintiff-Appellee,
v.
ECCELSTON PROPERTIES, LTD., Eccelston Leasing, Ltd.,
Roebling of New York, Inc., Funding Associates, Inc., WK,
Inc. III, Tri-Cities Associates, Fort Williams Associates,
Sierra Financial, Ltd., Michael J. Donoghue, Jay Landesman,
Defendants-Appellants,
John and Jane DOE # 1-20, and ABC Corporation # 1-20, Defendants.
 No. 481, Docket 95-7403.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 17, 1995.
Decided June 25, 1996.
 
 Peter M. Burke, Summit, New Jersey (David G. Hardin, Holly, English, Cooper, Rose & English, Summit, New Jersey, of counsel), for Plaintiff-Appellee.
 Thomas J. Kavaler, New York City (Richard C. Schoenstein, Cahill Gordon & Reindel, New York City, of counsel), for Defendants-Appellants Roebling of New York, Inc., Funding Associates, Inc., WK, Inc. III, Tri-Cities Associates, Fort Williams Associates, and Sierra Financial, Ltd.
 Kenneth A. Lapatine, New York City (Andrew L. Morrison, Camhy Karlinsky & Stein L.L.P., New York City, of counsel), for Defendants-Appellants Eccleston Properties, Ltd., Eccleston Leasing, Ltd., Michael J. Donoghue, and Jay Landesman.
 Before: CARDAMONE, MAHONEY, and WALKER, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendants-appellants Michael J. Donoghue, Jay Landesman, and a number of affiliated entities--Eccelston Properties, Ltd. ("Properties"), Eccelston Leasing, Ltd. ("Leasing"), Roebling of New York, Inc. ("Roebling"), Funding Associates, Inc. ("Funding"), WK, Inc. III ("WK"), Tri-Cities Associates ("Tri-Cities"), Fort Williams Associates ("Fort Williams"), and Sierra Financial, Ltd. ("Sierra")--appeal from an order entered April 14, 1995 in the United States District Court for the Southern District of New York, John S. Martin, Jr., Judge, that granted the motion of plaintiff-appellee Robert A. Pashaian for a preliminary injunction. See Pashaian v. Eccleston Properties, Ltd., No. 95 CIV.1920 (JSM), 1995 WL 168893 (S.D.N.Y. Apr. 7, 1995) (opinion granting preliminary injunction) ("Pashaian III"). The preliminary injunction bars pendente lite the disposition or transfer of various assets (and their proceeds) that were transferred from Properties and Leasing, against whom plaintiff-appellee Robert Pashaian has an $890,993.45 judgment, to other defendants-appellants. It is undisputed that subject matter jurisdiction is premised upon diversity of citizenship, and that the substantive (as distinguished from the recusal) issues on appeal are governed by New York law.
 
 
 2
 Defendants-appellants argue that Judge Martin erred by granting the preliminary injunction because he was obligated to recuse himself from the case pursuant to 28 U.S.C. § 455(b)(5)(iii).[1] They further contend that even if this statute did not require Judge Martin's recusal, his discretionary decision to recuse himself should have taken effect immediately, and that he therefore should not have decided the motion for a preliminary injunction. Defendants-appellants also claim that Judge Martin abused his discretion in granting Pashaian a preliminary injunction.
 
 
 3
 Affirmed.
 
 Background
 
 4
 From 1982 to 1986, Pashaian worked as a commissioned salesman for the Harkness Group ("Harkness"), which sold real estate partnerships and equipment leasing trusts that were sponsored by Properties and Leasing, and for Properties on at least two occasions. See Pashaian v. Eccelston Properties, Ltd., No. 92 CIV. 5487 (JSM), 1994 WL 389072 at * 1 (S.D.N.Y. July 22, 1994) ("Pashaian II "), aff'd, 52 F.3d 310 (2d Cir.1995) (table). Donoghue and Landesman were the sole shareholders of Properties, and Leasing was a wholly owned subsidiary of Properties.
 
 
 5
 A dispute arose regarding $536,486.09 that Pashaian claimed Properties, Leasing and Harkness owed him in unpaid commissions. See id. In June 1986, Pashaian commenced an arbitration proceeding against Properties, Leasing, Donovan, Landesman, and Harkness. Properties, Leasing, Donovan, and Landesman were found not to be subject to arbitration, and Pashaian obtained an arbitration award and subsequent judgment only against Harkness. Pashaian was unable to recover the judgment against Harkness, however, because Harkness was placed in bankruptcy. See Pashaian III, 1995 WL 168893 at * 1.
 
 
 6
 By 1990, the financial condition of Properties and Leasing had become precarious, and Donoghue and Landesman determined that the entities could no longer obtain the financing necessary to continue in operation. Donoghue and Landesman decided to create Sierra, a new entity that would own, develop, and operate real estate rather than syndicate real estate partnerships, and would not be subject to the obligations of Properties and Leasing.[2] Donoghue and Landesman are the officers and directors of Sierra, and Sierra's stockholders are two family trusts, the 1990 Donoghue Family Trust and the 1990 Maria Landesman Trust, of which Donoghue and Landesman are, respectively, beneficiaries. Donoghue and Landesman are also empowered to appoint successor trustees to their respective family trusts. The two family trusts acquired Sierra's common stock for $50,000.00.
 
 
 7
 On October 31, 1990, Properties entered into a transaction (the "1990 Transfer") in which it transferred a substantial portion of its assets to Sierra in exchange for 2,186 shares of Sierra's preferred stock, valued at $2,186,000.00. Among the assets that were transferred to Sierra was Properties' stock in its subsidiary Roebling, which had, between 1982 and 1990, performed management services for Properties for which it was allegedly owed more than $3,000,000.00. On May 28, 1991, Properties executed a contract (the "Pledge/Security Agreement") with Roebling whereby Properties pledged the 2,186 shares of Sierra's stock that it had received in the 1990 Transaction to secure payment of the management fees that Properties allegedly owed Roebling. Under the Pledge/Security Agreement, Properties was entitled to the first $750,000 of any payout on the Sierra stock, and Roebling was entitled to any surplus.
 
 
 8
 Frustrated in his attempt to collect his judgment against the bankrupt Harkness, Pashaian brought suit on June 23, 1992 in the Supreme Court of New York, New York County, against Properties, Leasing, Donoghue, and Landesman. See Pashaian v. Eccelston Properties, Ltd., No. 92 Civ. 5487 (JSM), 1993 WL 322835 at * 1 (S.D.N.Y. Aug. 16, 1993) ("Pashaian I "). The case was removed to the United States District Court for the Southern District of New York. That court granted a motion to dismiss Pashaian's fraud claims as time-barred, but denied a motion to dismiss his contract and New York Labor Law claims on that ground. See id.
 
 
 9
 at * 2-3. The district court subsequently granted summary judgment to Pashaian on his contract claims against Properties and Leasing in the amount of $890,993.45, consisting of the withheld commissions and accrued interest, on the basis that on February 10, 1986 and March 6, 1986, they had "signed writings pledging to pay [Pashaian] the debt owed him by [Harkness]." Pashaian II, 1994 WL 389072 at * 1.
 
 
 10
 Pashaian initiated discovery in order to collect this judgment, and learned of several transfers of assets from Properties and Leasing during 1994 that had culminated, and primarily occurred, on November 23, 1994 (the "1994 Transfers"), in the immediate aftermath of Pashaian II. As described by defendants-appellants in their response to an information subpoena served upon them by Pashaian, the November 23, 1994 transactions included the following: (1) Sierra redeemed 2,084 shares of its preferred stock held by Properties for $2,084,000, with $2,077,000 of this amount going to Roebling pursuant to the Pledge/Security Agreement. (2) Properties transferred land in Casper, Wyoming to Tri-Cities for $10,000. (3) Properties transferred land in Sylacagah, Alabama to Fort Williams for $7,800. (4) Leasing transferred land in Fargo, North Dakota to Tri-Cities in exchange for $10,000. The parties did not obtain appraisals of the land being sold in any of the foregoing transactions. (5) Properties transferred a $138,000 receivable due from Donoghue and a $94,000 receivable due from Landesman to Funding in exchange for a commitment by Funding to provide up to $350,000 to settle a pending dispute with the Internal Revenue Service regarding withholding tax. (6) Properties transferred a partnership interest in C.R. Income Partners to WK in exchange for commitments to (a) pay $75,000 in past and future legal fees, and (b) give Properties twenty percent of any partnership interest if C.R. Income Partners emerged from bankruptcy. In addition, on June 17 and June 21, 1994, Properties transferred its interest in the master leases and wrap-around mortgages for Stewart Associates, Aurora Associates, and Pinehurst Associates to Sierra in exchange for $500,000 worth of Sierra's preferred stock. Sierra later redeemed these shares on November 23, 1994, but the proceeds of the redemption went to Roebling pursuant to the Pledge/Security Agreement, as described above.
 
 
 11
 In further answer to Pashaian's information subpoena, defendants-appellants starkly described the outcome of the foregoing transactions:
 
 
 12
 Eccelston Properties ceased doing business as of November 23, 1994. As of that date Eccelston Properties had no assets.
 
 
 13
 Eccelston Leasing ceased doing business as of November 23, 1994. The only business left for Eccelston Leasing is in connection with the settlement of a tax dispute with the Internal Revenue Service.
 
 
 14
 Judge Martin summarized the situation as follows: "When [Pashaian] commenced discovery in aid of his efforts to collect the judgment, he learned that Landesman and Douglas ha[d], through a series of transactions, stripped [Properties and Leasing] of all [their] valuable assets and placed them in trusts for the benefit of themselves and their families." Pashaian III, 1995 WL 168893 at * 1.
 
 
 15
 After learning of these transactions, Pashaian initiated the present lawsuit on March 21, 1995 to set aside the transfers "on the ground that they were fraudulent as to Eccelston's creditors." Id. Judge Martin immediately issued a temporary restraining order enjoining defendants-appellants from disposing of the assets transferred pursuant to the disputed transactions.
 
 
 16
 The Sierra Defendants then retained Thomas J. Kavaler, a partner in the law firm of Cahill Gordon & Reindel ("Cahill"), to represent them in this action. Another partner at Cahill, Donald J. Mulvihill, is married to the sister of Judge Martin's wife. On March 24, 1995, Kavaler notified Judge Martin by letter that Cahill was representing a party in the case, and reminded Judge Martin of Mulvihill's affiliation with Cahill. More extended correspondence was submitted by Kavaler and Pashaian's counsel, and a hearing on the recusal issue was held on March 30, 1995. Toward the end of the hearing, Kavaler made an oral motion for Judge Martin to recuse himself. After examining, under seal, proof of Mulvihill's share of Cahill's profits, Judge Martin decided that he was not legally required to recuse himself from the case. He nonetheless decided to do so as a matter of prudence, lest he "put the parties at risk" of appellate reversal after prolonged further proceedings. He determined, however, that his recusal would become effective only after he had heard and decided the motion for a preliminary injunction, which was scheduled to be heard the next day (March 31, 1995), noting that "[a]ll of the papers have been assembled, associate hours have been billed or have been recorded ready for billing, and there will not be a substantial increment in [Cahill's] fees."
 
 
 17
 On April 6, 1995, Judge Martin issued Pashaian III, which granted Pashaian's motion for a preliminary injunction, concluding that:
 
 
 18
 [A]s a matter of law, the 1990 and 1991 transfers were fraudulent as to plaintiff and other creditors regardless of the actual intent of Donoghue and Landesman under § 273 of the [New York] Debtor and Creditor Law,[3] and ... the 1994 transfer of $2 million to Roebling was similarly fraudulent as to plaintiff without regard to actual intent under § 273-a.[4] In addition, the facts set forth above support the conclusion that there was in the 1990, 1991 and 1994 transactions an "actual intent ... to hinder, delay or defraud present or future creditors" so that those transactions were also fraudulent under § 276.[5]
 
 
 19
 1995 WL 168893 at * 4 (alteration of language of § 276 in Pashaian III ).
 
 
 20
 This appeal followed.
 
 Discussion
 
 21
 A. Recusal.
 
 
 22
 1. Standing.
 
 
 23
 Defendants-appellants argue that Judge Martin erred in declining to recuse himself from the decision of Pashaian's motion for a preliminary injunction. Because Judge Martin's relationship is with Sierra's attorneys, it might seem that any injury caused by his failure to recuse himself would fall solely upon Pashaian. (Ordinarily, after all, a kinship between a judge and counsel for a party creates an appearance of bias in favor of, rather than against, that party.) This inference calls into question defendants-appellants' standing to challenge Judge Martin's recusal determination. Neither party raises the standing issue on appeal, but because it is jurisdictional, see Thompson v. County of Franklin, 15 F.3d 245, 248 (2d Cir.1994), we must examine the issue sua sponte when it emerges from the record, see id.
 
 
 24
 As a threshold requirement for Article III standing, a plaintiff must establish a " 'personal injury,' " Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621, 624 (2d Cir.1989) (quoting Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)), that is " ' "distinct and palpable" ' ", id. (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (quoting Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975))). To the extent that defendants-appellants seek vicariously to raise an appearance of partiality of Judge Martin against Pashaian, then, they lack standing to do so. And to the extent that they seek to raise the issue on their own behalf, it is not immediately obvious what personal injury they might suffer as a result of the judge's indirect relationship to their own counsel.
 
 
 25
 It has been held in the context of a criminal trial that when a judge is alleged to have a bias against one defendant, co-defendants lack standing to appeal his refusal to recuse. See United States v. Hoffa, 382 F.2d 856, 861 (6th Cir.1967), cert. denied, 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968); cf. United States v. Sciarra, 851 F.2d 621, 636 (3d Cir.1988) (denying nonparty witnesses standing to challenge failure to recuse in context of order to compel their depositions). If a codefendant in a criminal prosecution cannot challenge a judge's refusal to recuse himself, it might be argued that parties other than those against whose interest the postulated bias might run also lack standing in a civil case.
 
 
 26
 In spite of these concerns, we believe that when a party has timely moved for the recusal of a district judge, that party has standing to challenge the judge's refusal to recuse even if the alleged bias would be in the moving party's favor. Such a party might legitimately be concerned that the judge will "bend over backwards" to avoid any appearance of partiality, thereby inadvertently favoring the opposing party. The possibility of this compensatory bias by an interested judge is sufficiently immediate to constitute the "personal injury" necessary to confer standing under Article III. We therefore conclude that the recusal issue is properly before us for decision.
 
 
 27
 2. Merits.
 
 
 28
 A judge must recuse himself if "a person within the third degree of relationship to either [him or his spouse], or the spouse of such a person[,] ... [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." § 455(b)(5)(iii), supra note 1. Mulvihill's wife is the sister of Judge Martin's wife. Because siblings are related within the third degree to each other, Mulvihill is among the class of people whose substantial interest in the case would require Judge Martin's recusal. Judge Martin found that Mulvihill did not have an interest that could be substantially affected by the outcome of this case, and consequently found § 455 to be inapplicable, but exercised his discretion to recuse himself as a matter of prudence following his resolution of the motion for a preliminary injunction.
 
 
 29
 Defendants-appellants urge us to adopt the rule of per se recusal that was articulated by the Fifth Circuit in Potashnick v. Port City Constr. Co., 609 F.2d 1101 (5th Cir.), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). In that case, the district judge's father was a partner of the attorney for one of the parties in the case. See id. at 1112. The Fifth Circuit held that "when a partner in a law firm is related to a judge within the third degree, that partner will always be 'known by the judge to have an interest that could be substantially affected by the outcome' of a proceeding involving the partner's law firm." Id. at 1113 (quoting § 455(b)(5)(iii)) (emphasis added).
 
 
 30
 We reject the Fifth Circuit's rule of automatic recusal. See SCA Servs., Inc. v. Morgan, 557 F.2d 110, 115-16 (7th Cir.1977) (per curiam) (considering circumstances of individual case in determining whether judge, whose brother was law partner of attorney in case, abused discretion in failing to recuse pursuant to § 455(b)(5)(iii)). Unlike § 455(a), which requires recusal whenever there is an objective appearance of bias, the plain language of § 455(b) makes clear that it applies only where one of the factual predicates has, in fact, occurred. See Sciarra, 851 F.2d at 635 ("Although subsection (a) requires only the objective appearance of bias, subsection (b)(1) requires bias-in-fact."); In re IBM Corp. (United States v. IBM Corp.), 618 F.2d 923, 929 (2d Cir.1980) (distinguishing between objective circumstances requiring recusal under § 455(b)(5) and the "so-called 'appearance of justice' rule" under § 455(a)). It would simply be unrealistic to assume, with Potashnick, that partners in today's law firms invariably "have an interest that could be substantially affected by the outcome of" any case in which any other partner is involved. 28 U.S.C. § 455(b)(5)(iii) (emphasis added). In the present case, for example, Judge Martin noted that Cahill, which had sixty partners as of March 1995, had a gross revenue in 1994 of approximately $117,500,000. After considering, under seal, the extent of Mulvihill's participation in the net income of Cahill, and the amount at stake in the present litigation, Judge Martin concluded that Mulvihill's interest would not be "substantially affected" by the outcome of this case. Judge Martin also took
 
 
 31
 judicial notice of those matters that add to the reputation of major law firms in the City of New York and conclude[d] that insofar as the reputation of [Cahill] is concerned, this matter is not of that significance to either add or detract from its reputation in the City of New York and, indeed, even in the nation or perhaps the world--given its offices in Europe.
 
 
 32
 These reasonable conclusions should not be ignored in favor of an unrealistic generalization that in our view is not supported, much less compelled, by the text of § 455(b)(5)(iii).
 
 
 33
 Our conclusion is strengthened by the fact that in justifying its per se rule of disqualification, Potashnick relied heavily upon an advisory opinion interpreting Canon 3C of the Code of Judicial Conduct. See Potashnick, 609 F.2d at 1114 (citing Advisory Committee on Judicial Activities, Advisory Opinion No. 58 (1978)). In the first place, this reliance is dubious because the advisory opinion is a nonbinding interpretation of a different rule, see In re Industrial Gas Antitrust Litig., No. 80 C 3479, 1985 WL 2869 at * 3 (N.D.Ill. Sept. 24, 1985), and because that other rule, Canon 3C of the Code of Judicial Conduct, is not independently enforceable on appeal, see United States v. Conforte, 457 F.Supp. 641, 656 (D.Nev.1978) ("[T]he disqualification provisions of the Code of Conduct can only be construed as establishing a standard for judicial behavior rather than as imposing a mandatory duty enforceable after the fact by the reversal of otherwise proper judicial decisions."), modified on other grounds, 624 F.2d 869 (9th Cir.), cert. denied, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); Duplan Corp. v. Deering Milliken, Inc., 400 F.Supp. 497, 505 (D.S.C.1975) ("[O]nce a federal judge has commenced his deliberations in a particular action, any challenge to his continued consideration of that matter, based on grounds for which Congress has provided a remedy, must employ those remedies and not the Code of Judicial Conduct."). More importantly, because Canon 3C requires disqualification where a judge's "impartiality might reasonably be questioned," it imposes a requirement that is analogous to § 455(a)'s "appearance of justice" test rather than the "in-fact" test of § 455(b). An interpretation of Canon 3C, then, is not persuasive in the present case, which is based upon subsection (b) of § 455.
 
 
 34
 Defendants-appellants argue that even if Judge Martin's decision to recuse himself was not required by § 455(b)(5)(iii), once he decided to recuse himself as a matter of discretion, such recusal had to be total and immediate. Thus, they claim, his ruling on the motion for a preliminary injunction was improper whether or not his recusal was required by law. In support of this contention, they rely primarily upon United States v. Feldman, 983 F.2d 144 (9th Cir.1992). We consider Feldman distinguishable. That case invalidated a district judge's attempted ongoing participation in the sentencing of a criminal defendant on remand, with only the restitution aspect of the resentencing assigned to another judge. (As a result of a merger announced during the pendency of the appeal, the initial judge was to become a stockholder in an institution to which the defendant had been ordered to pay restitution.) In this case, by contrast, Judge Martin decided to recuse himself in toto for prudential reasons, but to do so only after deciding a motion for a preliminary injunction scheduled to be heard the day after the recusal hearing, in a case which sought enforcement of a judgment ensuing from litigation that had commenced before him almost four years earlier.
 
 
 35
 We regard this as a practical and appropriate resolution of the situation that confronted Judge Martin. We note also the potential for mischief in imposing an inflexible rule whose nonobservance would require reversal in this case. Judge Martin acknowledged that the Sierra Defendants had not hired Cahill to cause his recusal, but expressed concern about "the ability of a party to recuse a judge by hiring a particular lawyer." We share that concern, and are accordingly loathe to articulate a rule that would frustrate or obviate the careful exercise of judicial discretion by district judges in responding to recusal motions in unusual circumstances, an exercise exemplified by Judge Martin's rulings in this case.
 
 
 36
 Because Judge Martin did not err in deciding the motion for a preliminary injunction before effecting his recusal, we turn to the merits of that ruling.
 
 
 37
 B. Preliminary Injunction.
 
 
 38
 In order to be entitled to a preliminary injunction, Pashaian was required to "demonstrate that [he was] likely to suffer possible irreparable harm if the requested relief [was] not granted and 'either (1) a likelihood of success on the merits of [his] case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [his] favor.' " Citibank, N.A. v. Nyland (CF8) Ltd., 839 F.2d 93, 97 (2d Cir.1988) (quoting Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 314-15 (2d Cir.1982)). We review the district court's grant of a preliminary injunction for abuse of discretion, including the application of an incorrect legal standard or basing the injunction upon a clearly erroneous finding of fact. Waldman Publishing Corp. v. Landoll, Inc., 43 F.3d 775, 780 (2d Cir.1994).
 
 
 39
 As previously noted, the district court ruled that: (1) the 1990 Transfer and the Pledge/Security Agreement were made "without a fair consideration" at a time when Properties "[was] or [would] be thereby rendered insolvent" in violation of Debtor and Creditor Law § 273, see supra note 3; (2) the 1974 Transfers were made "without fair consideration" in violation of § 273-a, see supra note 4; and (3) all these transactions were made "with actual intent ... to hinder, delay, or defraud either present or future creditors" in violation of § 276, see supra note 5. Pashaian III, 1995 WL 168893 at * 4. The court accordingly concluded that Pashaian "ha[d] established a strong likelihood of success on the merits," id. at * 5, and had also "establish[ed] a likelihood of irreparable harm" by "demonstrat[ing] an intent by the defendant to frustrate" collection of the judgment that Pashaian was attempting to enforce, id. Defendants-appellants contest Judge Martin's rulings on numerous grounds.
 
 
 40
 We find no error in any of Judge Martin's determinations, but there is no need to parse all of these rulings and all of defendants-appellants' arguments against them. Based upon the facts presented on this record, Judge Martin concluded that the 1990 Transfer, the Pledge/Security Agreement, and the 1994 Transfers were all made "with actual intent ... to hinder, delay, or defraud either present or future creditors" in violation of § 276 of the Debtor and Creditor Law, supra note 5. His conclusion is, to say the least, not clearly erroneous as to any of these transactions, and obviates the need for any particular findings as to insolvency and fair consideration under § 273, supra note 3, or the timing of the transfers vis-a-vis Pashaian's uncollected judgment for purposes of § 273-a, supra note 4.
 
 
 41
 In order to affirm, moreover, we need only determine that Judge Martin did not clearly err in ruling that the Pledge/Security Agreement was undertaken with the intent to defraud creditors. If so, even assuming arguendo that the 1994 Transfers were otherwise legitimate, the illegitimacy of the Pledge/Security Agreement invalidates the pass through of the dividend on Sierra's preferred stock to Roebling. Rather, the entire $2,084,000 dividend belongs to Properties. Since this is far more than enough money to satisfy Pashaian's September 1994 judgment, for which Properties is fully liable, Pashaian is likely to succeed on the merits in this lawsuit.
 
 
 42
 Judge Martin's finding that the Pledge/Security Agreement is fraudulent finds strong support in New York law. In the context of determining fair consideration under § 273, the general rule is that the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property, and that "at least where no actual intent to hinder, delay, or defraud creditors has been shown[,] ... even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance." HBE Leasing Corp. v. Frank, 48 F.3d 623, 634 (2d Cir.1995).
 
 As we next observed, however:
 
 43
 New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration. See Farm Stores, Inc. v. School Feeding Corp., 102 A.D.2d 249, 477 N.Y.S.2d 374, 378 (1984), aff'd, 64 N.Y.2d 1065, 489 N.Y.S.2d 877, 479 N.E.2d 222 (1985); Southern Industries, Inc. v. Jeremias, 66 A.D.2d 178, 411 N.Y.S.2d 945, 949 (1978).
 
 
 44
 HBE Leasing Corp., 48 F.3d at 634-35; see also Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir.1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); Laco X-Ray Sys., Inc. v. Fingerhut, 88 A.D.2d 425, 433, 453 N.Y.S.2d 757, 762 (2d Dep't 1982) (fair consideration lacking when assets of corporation "were conveyed in such a manner that its principals ... became preferred creditors to the detriment of other creditors"), appeal dismissed, 58 N.Y.2d 606, 447 N.E.2d 86, 460 N.Y.S.2d 1026 (1983)(table); Studley v. Lefrak, 66 A.D.2d 208, 215, 412 N.Y.S.2d 901, 906 (2d Dep't), (dominant stockholder of corporation could not "withdraw the capital of the corporation, or prefer himself as a creditor"), aff'd mem., 48 N.Y.2d 954, 401 N.E.2d 187, 425 N.Y.S.2d 65 (1979).[6]
 
 
 45
 In sum, New York law would not allow the Pledge/Security Agreement to qualify as "fair consideration" under § 273. Furthermore, a cause of action under § 276 "may lie even where fair consideration was paid and where the debtor remains solvent." Grumman Aerospace Corp. v. Rice, 199 A.D.2d 365, 366, 605 N.Y.S.2d 305, 307 (2d Dep't 1993) (mem.) (collecting cases); see also ACLI Gov't Sec., Inc. v. Rhoades, 653 F.Supp. 1388, 1395 n. 32 (S.D.N.Y.1987) ("[I]f other circumstances warrant a finding of fraudulent intent, the conveyance may be found fraudulent even if it was based on fair consideration, or if the debtor remained solvent after the conveyance.") (citations omitted), aff'd, 842 F.2d 1287 (2d Cir.1988) (table); De West Realty Corp. v. IRS, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976) (" 'Actual intent ... to hinder, delay, or defraud either present or future creditors ...' is sufficient to render conveyances fraudulent, and even 'fair consideration' cannot save conveyances made under the circumstances proscribed by Section 276."); Elliott v. Elliott, 365 F.Supp. 450, 454 (S.D.N.Y.1973) (where intent to hinder, delay, or defraud creditors is shown, "the conveyance is fraudulent even though the grantor is solvent, and even if he receives fair and adequate consideration.") (citations omitted); United States v. 58th St. Plaza Theatre, Inc., 287 F.Supp. 475, 498 (S.D.N.Y.1968). ("[E]ven 'fair consideration' cannot save conveyances made under the circumstances proscribed by Section 276."). A fortiori, in this case, where New York law precludes a ruling that "fair consideration" was given to Properties for entering into the Pledge/Security Agreement and the district court has made an amply supported finding that Properties entered into that agreement "with actual intent to hinder, delay, or defraud" Pashaian in violation of § 276, Pashaian is more than likely to succeed on the merits.
 
 
 46
 Finally, although injuries compensable by monetary damages ordinarily do not give rise to irreparable harm, see Borey v. National Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir.1991), "[a] preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." Gelfand v. Stone, 727 F.Supp. 98, 100 (S.D.N.Y.1989) (citing Republic of the Philippines v. Marcos, 806 F.2d 344, 356 (2d Cir.1986), cert. dismissed, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987), cert. denied, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); In re Feit & Drexler, Inc. (Green v. Drexler), 760 F.2d 406, 416 (2d Cir.1985)). A fortiori, the irreparable harm requirement is satisfied in this case, which involves completed actions to frustrate a judgment, rather than an inferred intention to take future such actions. Defendants-appellants have admitted, in response to an information subpoena, that they undertook transfers that left Properties and Leasing without any assets to satisfy Pashaian's judgment, thereby continuing an unrelenting campaign to avoid paying obligations to Pashaian that were incurred more than ten years ago, and on which he was accorded summary judgment when they were litigated.[7]
 
 Conclusion
 
 47
 The order of the district court that granted a preliminary injunction to Pashaian is affirmed. The mandate shall issue forthwith.
 
 
 
 [1]
 Section 455(b)(5)(iii) provides in pertinent part that: "[Any judge of the United States] ... shall ... disqualify himself ... [when] [h]e or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person[,] ... [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."
 
 
 [2]
 The remaining nonpersonal defendants-appellants (other than Properties and Leasing) are affiliated with Sierra. Funding and WK are wholly owned subsidiaries of Sierra. Tri-Cities is a limited partnership in which Sierra has an ownership interest. Fort Williams is a limited partnership that is affiliated with Roebling. As will appear, Roebling is now a wholly owned subsidiary of Sierra. Donoghue and Landesman are the sole officers and directors of Fundings, WK, and Roebling. All of these nonpersonal entities, including Sierra, are collectively referred to herein as the "Sierra Defendants."
 
 
 [3]
 Section 273 provides: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. Law § 273 (McKinney 1990)
 
 
 [4]
 Section 273-a provides:
 Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.
 N.Y. Debt. & Cred. Law § 273-a (McKinney 1990).
 
 
 [5]
 Section 276 provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276 (McKinney 1990)
 
 
 [6]
 Defendants-appellants contend that these cases are distinguishable because they "did not involve transactions between distinct corporate entities but involved conveyances in which the individual officers or directors of the corporations at issue were the recipients." As one would anticipate, however, the New York rule may not be circumvented by the facile stratagem of forming a corporation. In Laco X-Ray Systems, for example, contrary to the assertion of defendants-appellants, the transfer at issue was "from Cross County [Radiological Associates, P.C.] to Radiological [Associates of Long Island, P.C.], both alter egos of [the individual] defendant." 88 A.D.2d at 432, 453 N.Y.S.2d at 762. Further, Studley explicitly states: "A transfer of all the assets of a corporation to a sole stockholder or to a corporation controlled by the stockholder may be set aside when made in derogation of the rights of creditors." 66 A.D.2d at 213, 412 N.Y.S.2d at 905 (emphasis added) (collecting cases)
 
 
 [7]
 We are unpersuaded by defendants-appellants argument that the complaint did not adequately state the factual and legal bases for the relief sought. Defendants-appellants were not deprived of adequate notice regarding the matters at issue, and the Complaint may be deemed amended to conform to the proof developed during discovery. Cf. Fed.R.Civ.P. 15(b) (authorizing amendment of pleadings to conform to evidence at trial)