**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-4606

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHAEL MITRY HADEED, JR.,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:08-cr-00461-LMB-1)

Argued: March 24, 2010

Decided: April 30, 2010

Before MICHAEL and DAVIS, Circuit Judges, and Eugene E. SILER, Jr., Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Affirmed by unpublished opinion. Senior Judge Siler wrote the opinion, in which Judge Michael and Judge Davis joined.

**ARGUED:** Laurin Howard Mills, LECLAIR RYAN, PC, Alexandria, Virginia, for Appellant. Joshua L. Rogers, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** William B. Cummings, WILLIAM B. CUMMINGS, PC, Alexandria, Virginia, for Appellant. Anthony Asuncion, Special Attorney to the Attorney General of the United States, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

SILER, Senior Circuit Judge:

Michael Hadeed, Jr., was convicted by a jury of conspiracy to commit immigration fraud and to defraud the United States in violation of 18 U.S.C. § 371 and aiding and abetting a material false statement to a United States government agency in violation of 18 U.S.C. §§ 1001 and 2. He now appeals his conviction on three alleged errors: (1) admission of certain testimonial evidence; (2) insufficient evidence; and (3) jury instructions. For the following reasons we AFFIRM.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. Factual Background

Hadeed is a Virginia attorney engaged in the practice of immigration law. Antoine "Tony" Tahan, a former client of Hadeed, owns and operates the King of Pita Bakery. Hadeed provided general legal services to Tahan for several years. Hadeed's conviction was based on an agreement between himself and Tahan, in which Tahan's business sponsored immigrants to work as bakers so that they could obtain legal permanent resident status based on fraudulent information. Tahan pleaded guilty to immigration fraud and testified on behalf of the government.

3

1. Legal permanent resident status for a skilled worker

Obtaining a labor certification to enter the United States and attaining lawful permanent resident status as a skilled worker involves a four-part process. First, the employer must allow skilled American workers the opportunity to apply for the position. Second, if the employer cannot find an American worker to fill the position, the employer and prospective alien employee apply for a labor certificate by submitting Form ETA-750 to a state employment agency and, if approved by the state, to the United States Department of Labor. That form describes the qualifications required for the position and the alien's relevant job experience or education. The alien must attach an "experience letter," written by a prior employer in the alien's home country that sets forth his place of prior employment, position, duration of his employment, and salary. If this letter contains false information, the request for certification will be denied and could result in the alien's being barred for life from the United States.

Third, if the Department of Labor issues a labor certification, the employer then files an Immigrant Petition for Alien Worker, known as a Form I-140, with the former Immigration and Naturalization Service ("INS"), now the Department of Homeland Security ("DHS"). Form I-140 asserts that the alien has sufficient job experience or education and meets the

4

requirements for the particular position. If the I-140 is approved, the alien then submits either a Form I-485 application for permanent residence adjustment of status (if he is living inside the country), or a Form DS-230 application for an immigrant visa (if he is living outside the country). The Form DS-230 includes a "skilled worker" section so consulate offices can confirm that aliens coming to the United States to perform a particular job have the requisite work experience. If the consulate office discovers that the DS-230 is fraudulent, the visa application is denied and the office typically recommends revocation of the petition.

2. Evidence Presented at Trial

a. *Fraudulent application of Marouf Abrid*

Tahan met Marouf Abrid at an airport in Beirut, Lebanon where Abrid worked as a bartender. Abrid came to the United States in 1999 and Tahan introduced him to Hadeed.[1] Abrid told Hadeed that he had been working as a bartender. Nonetheless, Hadeed told Abrid that Tahan could file a petition for him to become an employee at King of Pita as a skilled worker. Hadeed told Abrid that he would need an employment letter stating that he was a baker and that he had at least four years of

---

[1] Tahan served as a translator during the meetings between Abrid and Hadeed.

5

experience. When Tahan showed Abrid's letter to Hadeed, Hadeed said it was no good because it did not state that he had four years of experience as a baker. Tahan then drafted a second letter for Abrid, based on what Hadeed told him should be included. Hadeed submitted this letter with Abrid's immigration paperwork.

To allow skilled American workers the opportunity to fill the position, Hadeed advertised for the position in a newspaper. Tahan found this advertisement to be confusing, however. When he confronted Hadeed, Hadeed told him it was not important and that "[t]he harder it is for people to respond to [the] ad, the better it is."

b. *Fraudulent application of Ibrahim Alakwa*

In early 2000, Hadeed asked Tahan if he would be interested in sponsoring other immigrants and told him that these immigrants did not actually have to work at King of Pita, so long as King of Pita was listed as their sponsor. Hadeed indicated that if Tahan agreed to do this, Hadeed would forgive the debt Tahan owed him for legal services. Tahan agreed.

Hadeed introduced Tahan to Ibrahim Alakwa in early 2003. Despite Alakwa's lack of experience in baking, Hadeed prepared Alakwa's immigration papers, which indicated he was an experienced baker. Alakwa received a labor certification from the Department of Labor. Although Tahan, Hadeed, and Alakwa did

not intend for Alakwa to work at King of Pita, Hadeed suggested Alakwa should go through training at King of Pita, "in case he would be asked by the immigration officials any questions about the company or the process of his experience." Hadeed also told Tahan to issue payroll checks to Alakwa, but no money was to change hands. Alakwa would cash his payroll checks and return the money to Tahan.

### c. Fraudulent application of Juana Pagoaga

Juana Pagoaga, a Honduran employee of King of Pita, testified that she was introduced to Hadeed's law firm by Ana Araos, a paralegal at the firm. Araos led a presentation on immigration issues at King of Pita, during which she told the attendees that they needed an experience letter. Pagoaga obtained a letter from her mother in Honduras and gave it to Araos. Araos showed the letter to Hadeed. Neither Hadeed nor Araos thought the letter was sufficient, and Araos told Pagoaga that the letter needed to say that she had experience as a pastry cook, even though Pagoaga did not have such experience. Pagoaga obtained a second letter, which Hadeed used to prepare and submit her ETA-750 and I-485.

### d. Fraudulent application of Jean Claude Sakr

Jean Claude Sakr, who also pleaded guilty to immigration fraud and cooperated with the government, testified that he met Hadeed when he was seeking assistance with an application for

political asylum. Instead, Hadeed suggested he apply for employment sponsorship, because it was easier and faster. Shortly after Sakr began working at King of Pita, he showed Hadeed two experience letters he had brought with him from Lebanon, indicating his experience as a bartender. Hadeed told him there were too many bartenders in America, and that he needed a letter stating he was a baker. Sakr obtained a letter, and Hadeed prepared Sakr's application with it. His application was denied, however, due to fraudulent documentation.

### e. *Fraudulent application of Charbel Freifer*

Sakr introduced Charbel Freifer to Tahan, who then introduced Freifer to Hadeed.[2] Although Freifer had a student visa, Hadeed was going to help him get a work visa. Freifer told Hadeed he had never been a baker, but Hadeed told him that he needed a letter attesting to the fact that he had worked as a baker. Freifer obtained such a letter, which Hadeed used in preparing and submitting his Form ETA 750 labor certification application and his Form DS-230 visa application. Before any agency action was taken on the Form DS-230, Hadeed had stopped working on Freifer's case, and Freifer had obtained new counsel.

---

[2] Tahan also served as a translator for Hadeed during these meetings.

*f. Hadeed's statements*

Vikki Ravinskas, the office manager at Hadeed's law firm, testified regarding two conversations she had with Hadeed. In one instance, Ravinskas received a phone call from Araos, who told Ravinskas that she had been arrested for immigration fraud and asked Ravinskas to tell Hadeed. When Ravinskas told Hadeed that information, he became very agitated and said, "It should have been me that they were coming for. It should have been me, not Ana." He also said he needed to get an attorney. In another instance, Ravinskas told Hadeed that she had learned that Tahan was cooperating with the government. Hadeed became frantic and said, "They're coming for me next. I should have known. I shouldn't have been in this. They're coming for me next."

*g. Mark Mancini's testimony*

Hadeed's theory of the case was that he was unaware of the fraud. Instead, he relied on Tahan, who interpreted for many of the aliens, to truthfully convey their experience. Hadeed called one expert witness, Mark Mancini, who was qualified as an expert in the practice of immigration law. Mancini testified as to the standards that immigration attorneys are expected to uphold. In particular, he explained that immigration attorneys assisting aliens who are seeking a labor certification should first explain the job experience requirement for that particular

9

position. He also explained that it was standard practice to provide a handwritten sample of an experience letter for the client. He further stated that if a client brought back a letter without all of the required information, he would tell him it needed to be corrected. However, Mancini said that if he knew a client was not qualified for a particular position, but intended on pursuing the application, he would refuse to represent him. Moreover, he would never counsel a client to obtain an experience letter for work experience he knew the client did not have.

Mancini also testified that because Virginia's unemployment level between May 2001 and April 2004 was low, there was not a significant difference between the demand for skilled and unskilled workers. Accordingly, the wait for approval as a skilled worker was roughly equivalent to that of an unskilled worker. Additionally, unskilled applicants did not need to submit a letter establishing their work experience. He stated that all immigration lawyers would have known that fact.

B. Procedural Background

At the close of the government's case, the district court granted Hadeed's motion under Federal Rule of Criminal Procedure 29(a) to dismiss two additional counts for lack of evidence. The district court denied Hadeed's motion for a jury instruction

on multiple conspiracies, and the jury convicted Hadeed of the remaining counts. The district court denied Hadeed's motion for judgment of acquittal or, in the alternative, a new trial. Hadeed was sentenced to two years' probation and a $2000 fine.

## II. ANALYSIS

A. Statement to Ravinskas

Hadeed contends that the district court abused its discretion in failing to exclude part of Ravinskas's testimony. We review the district court's evidentiary rulings for abuse of discretion, and "we will not vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally in admitting evidence." United States v. Basham, 561 F.3d 302, 325-26 (4th Cir. 2009) (internal quotation marks and citations omitted).

Hadeed objected to the testimony by Ravinskas concerning Hadeed's statement when he found out that Araos was arrested. Araos's arrest was, in fact, connected to a separate immigration fraud scheme, the Pillar investigation. In a pre-trial ruling, the district court excluded as irrelevant the introduction of any evidence related to this investigation.

Although Hadeed's brief focused exclusively on Rule 404(b), at oral argument he claimed that the testimony was inadmissible under Rule 401, not 404(b). Under Rule 401, relevance "means

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 404(b), which excludes "[e]vidence of other crimes, wrongs, or acts" when admitted "to prove the character of a person in order to show action in conformity therewith," Fed. R. Evid. 404(b), limits only the admission of evidence of acts extrinsic to the one charged, but does not limit the admission of evidence of intrinsic acts. United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996). Other acts are intrinsic when they are "inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." Id. (internal quotation marks omitted).

The evidence indicates that Hadeed had no knowledge of the Pillar conspiracy.[3] Ravinskas's testimony also does not indicate whether she specified the basis for Araos's arrest. Because Hadeed did not know about the Pillar investigation when Ravinskas told him that Araos had been arrested for immigration fraud, he appears to have assumed her arrest was based on either

_____

[3] At oral argument, counsel for Hadeed stated that when Hadeed made this statement, he knew that Araos had been arrested pursuant to the Pillar investigation. However, he never indicated that fact in his briefs.

12

the King of Pita scheme or some other general immigration fraud scheme.  Either way, his response, "It should have been me, not Ana," demonstrated a consciousness of guilt for acts that were inextricably intertwined to the King of Pita scandal.  In addition, the statement corroborated a similar subsequent statement he made to Ravinskas upon learning that Tahan was cooperating with the government.  Accordingly, the statement was relevant and intrinsic to the charge at issue.[4]

B.    Materiality of False Statement

Under 18 U.S.C. § 1001 it is unlawful to knowingly and willfully make a material false statement to any government agency.  Hadeed was charged with aiding and abetting Freifer in submitting Form DS-230 to the Department of State, which contained the false statement that Freifer had been employed as

_____

[4] Moreover, any error was harmless.  "Where error is founded on a violation of Rule 404(b), the test for harmlessness is 'whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"  United States v. Madden, 38 F.3d 747, 753 (4th Cir. 1994) (quoting United States v. Nyman, 649 F.2d 208, 211-12 (4th Cir. 1980)).   In light of Hadeed's second statement to Ravinskas, the verdict was not substantially swayed by any error in admitting his first statement.  The jury heard evidence that Hadeed's second statement was made in direct response to his discovery of the underlying investigation at issue in this case, and this statement was more heavily relied upon by the government.   There was also ample additional testimonial evidence against Hadeed.

13

a baker by the Al Najah Bakery in Lebanon from 1997 to 2001. Hadeed argues that his motion for judgment of acquittal should have been granted as to this count, because the false statement at issue was not material as a matter of law. We review a district court's denial of a motion for judgment of acquittal de novo, viewing the evidence in the light most favorable to the government. United States v. Midgett, 488 F.3d 288, 297 (4th Cir. 2007).

A statement "is material if it has a natural tendency to influence, or was capable of influencing, the decision of the body to which it was addressed." Kungys v. United States, 485 U.S. 759, 770 (1988) (internal quotation marks omitted); see also United States v. Benkahla, 530 F.3d 300, 310 (4th Cir. 2008). In an immigration context, evidence of materiality must be "sufficient to raise a fair inference that a statutory disqualifying fact actually existed." Kungys, 485 U.S. at 783 (Brennan, J., concurring); see also United States v. Puerta, 982 F.2d 1297, 1304 (9th Cir. 2002); United States v. Agunbiade, 1999 WL 26937 at *3 (4th Cir. Jan. 25, 1999) (unpublished table) (concluding that appellant's failure to disclose his prior deportation and arrest "could have influenced the INS'[s] decision with regard to his naturalization application," and was therefore material).

14

Viewing the evidence in the light most favorable to the government, there was sufficient evidence to demonstrate the materiality of the statement at issue. For example, Cathleen Carothers, an employee of the Department of State, in the Bureau of Consular Affairs, which offers legal advisory opinions on visa issues, testified that "[i]f fraud was found [in the Form DS-230], . . . and it . . . qualified for an ineligibility, then the consular officer would find the applicant ineligible for the visa and would typically return the petition to DHS with a recommendation of revocation."

Hadeed argues that because the circumstances in Virginia would have allowed Friefer to qualify for a visa as an unskilled worker, a fact that was supported by expert testimony, the statement was not material. However, even if Freifer could have qualified for an employment-based visa without work experience, the particular type of visa he sought required relevant work experience. As Carothers testified, consulate offices "rely very heavily" on the portion of the Form DS-230 that addresses previous employment in deciding how to process a skilled worker immigrant visa.

This case is distinguishable from Forbes v. INS, 48 F.3d 439, 443 (9th Cir. 1995) (holding that Forbes's failure to disclose his prior arrest on his visa application was not material, because the charges were eventually dropped and would

15

not have impacted the visa determination); and La Madrid-Peraza v. INS, 492 F.2d 1297 (9th Cir. 1974) (concluding that the petitioner's overstatement of the wages she was to receive from her prospective job was not a material misrepresentation, because the overstatement would not have justified a refusal to issue a visa given that there was no evidence that her wage was below the prevailing wage for similar jobs in her area (citing Chaunt v. United States, 364 U.S. 350 (1960)). In the case at hand, Freifer's misrepresentations regarding his prior employment history would have impacted his visa determination, because he was applying for a skilled worker visa. As Carothers testified, an applicant's prior employment as listed on the Form DS-230 is directly relevant to the issuance of such a visa. Thus, the misstatement is the kind that would "[have] a natural tendency to influence, or [be] capable of influencing, the decision of the body to which it was addressed." Kungys, 485 U.S. at 770.

C. Conspiracy Instruction

We review a district court's jury instructions for an abuse of discretion. United States v. Jeffers, 570 F.3d 557, 566 (4th Cir. 2009). In reviewing jury instructions, "we will not reverse a conviction so long as the instructions, taken as a whole, adequately state the controlling legal principles." Id.

16

at 566-67 (citing United States v. Bolden, 325 F.3d 471, 486 (4th Cir. 2003)). Hadeed argues that although the indictment charged a single conspiracy, the government's proof demonstrated multiple conspiracies and the district court's refusal to instruct the jury on multiple conspiracies created a prejudicial variance.

"[A] defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." United States v. Kennedy, 32 F. 3d 876, 883 (4th Cir. 1994). We will only find error in a conspiracy instruction "if the proof of multiple conspiracies was likely to have confused the jury into imputing guilt to the defendant as a member of one conspiracy because of the illegal activity of members of the other conspiracy." Jeffers, 570 at 567 (citation, alteration, and internal quotation marks omitted). "A single conspiracy exists when '[t]he conspiracy had the same objective, it had the same goal, the same nature, the same geographic spread, and the same product.'" United States v. Johnson, 54 F.3d 1150, 1154 (4th Cir. 1995) (quoting United States v. Crockett, 813 F.2d 1310, 1317 (4th Cir. 1987)).

The government's theory of conspiracy was that Hadeed and Tahan formed the hub of a single conspiracy and the five aliens

17

were the co-conspirators. Relying on Kotteakos v. United States, 328 U.S. 750 (1946) (holding there was no proof of a single conspiracy where there was one key figure and no connection between the co-conspirators, because "the pattern was 'that of separate spokes meeting at a common center,' though we may add without the rim of the wheel to enclose the spokes"); and United States v. Chandler, 388 F.3d 796 (11th Cir. 2004) (applying Kotteakos and concluding the evidence did not prove a single conspiracy, because "[u]nlike the classic hub-and-spoke conspiracy, . . . [the defendant] was the only conspirator in the hub, and when he moved from spoke to spoke, he moved alone"), Hadeed contends that the government needed proof that each of the individual aliens had to be involved in some concerted action in furtherance of the conspiracy. What Hadeed overlooks, however, is that this is not a conspiracy with a single-man hub forming agreements with five individual co-conspirators. Instead, the evidence produced at trial demonstrated a single agreement between Tahan and Hadeed, which formed the hub, and separate agreements with the five co-conspirators. Accordingly, this case is distinguishable from Kotteakos and Chandler, in which the only agreements at issue were the individual agreements with the "spokes." Accordingly,

18

the agreement between Tahan and Hadeed constituted a single conspiracy and was not a variance from the indictment.

<u>AFFIRMED</u>