TRAFALGAR POWER, INC. and
Christine Falls Corporation,
Plaintiffs

v.

AETNA LIFE INSURANCE COMPA-
NY, Algonquin Power Corporation,
Inc., Algonquin Power Income Fund,
and Algonquin Power Fund (Canada)
Inc., Defendants.

Algonquin Power Corporation, Inc.
and Algonquin Power Income
Fund, Plaintiffs,

v.

Trafalgar Power, Inc., Christine Falls
Corporation, Pine Run Virginia, Inc.,
and American Casualty Company of
Reading, Pennsylvania, Defendants.

Nos. 99–CV–1238, 00–CV–1246.

United States District Court,
N.D. New York.

Jan. 16, 2001.

Harris Beach & Wilcox, Rochester, NY (Paul J. Yesawich, III, of counsel), for Plaintiffs (99–CV–1238) and for Defendants (00–CV–1246).

Nixon Peabody, LLP., Rochester, NY (Robert B. Calihan, Andrew M. Burns, of counsel), for Defendant Aetna Life Insurance Company (99–CV–1238).

Menter Rudin & Trivelpiece, Syracuse, NY (Michael J. Katz, of counsel), Rackemann Sawyer & Brewster, Boston, MA (J. David Leslie, Eric A. Smith, Brian M. Hurley, of counsel), for Defendants Algonquin Power Corporation, Inc., et al. (99–CV–1238) & Plaintiffs (00–CV–1246).

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

In this recently consolidated action, plaintiffs Algonquin Power Corporation, Inc., and Algonquin Power Income Fund (collectively Algonquin), move in 00–CV–1246 for an order of attachment pursuant to Fed.R.Civ.P. 64 and/or a preliminary injunction pursuant to Fed.R.Civ.P. 65 freezing a $7.6 million tort judgment that defendant Trafalgar Power, Inc. (TPI) obtained in a separate yet related professional malpractice action. In support of the motion, Algonquin argues that TPI fraudulently assigned the $7.6 million judgment to defendant Pine Run Virginia, Inc., and that Pine Run is a shell corporation of Marina Development, Inc.—the corporation which in turn owns TPI. Algonquin asserts that the assignment was designed to frustrate any judgment it might realize on counterclaims asserted against TPI in 99–CV–1238, another separate but related action. TPI, Pine Run and defendant Christine Falls Corporation (CFC) oppose the motion and, without citing any specific subsection of Fed.R.Civ.P. 12, move to dismiss 00–CV–1246 based on the pendency of 99–CV–1238.

In addition to the motion for an order of attachment and/or a preliminary injunction in 00–CV–1246, Algonquin moved for an order consolidating that action with 99–CV–1238. Aetna Life Insurance Company, a defendant in 99–CV–1238, moved to intervene.

Pursuant to 28 U.S.C. § 636(b)(1)(A) & (B), the matter was referred to Magistrate Judge Peebles for proposed findings of fact and recommendations for disposition of Algonquin's motion for an order of attachment and/or preliminary injunction and the cross motion to dismiss, in addition to deciding the various non-dispositive motions. In a Report, Recommendation and Order dated November 8, 2000 (the Report), the Magistrate Judge decided the motions for non-dispositive relief by granting Algonquin's motion for consolidation of 00–CV–1246 with 99–CV–1238, and denying Aetna's motion for leave to intervene as moot. With respect to the remaining motions, the Magistrate Judge concludes that Algonquin is entitled to both an order of attachment and a preliminary injunction. However, he ultimately recommends that the court (1) grant the motion for a preliminary injunction, (2) deny the motion for an order of attachment, and (3) deny the cross motion to dismiss.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(b), the parties have filed numerous timely objections to the Magistrate Judge's Report. Thus, the court is required to undertake a *de novo* review of those portions of the Report to which the parties specifically object and may "accept,

reject or modify, in whole or in part, the findings or recommendations" in the Report. 28 U.S.C. § 636(b)(1)(C). Having carefully considered the Report, the parties' objections, and the record, the court adopts the Magistrate Judges's findings and recommendations, but for reasons different than those contained in the Report.

## BACKGROUND

A full recitation of the facts and procedural history of this case, as well as the other related actions, is set forth in the Report of Magistrate Judge Peebles, familiarity with which is assumed. However, to better understand these instant motions, it is necessary to particularize the facts relating to the three different actions. In the late 1980's, defendant TPI, a Delaware corporation, acquired and developed seven hydroelectric plants in upstate New York. Defendant CFC, a wholly-owned subsidiary of TPI, was a New York corporation incorporated to develop the hydroelectric plant located in Christine Falls, New York.[1] Defendant Pine Run is a Delaware corporation with its principal place of business in Richmond, Virginia, and was incorporated to perform work associated with a large real estate subdivision located in Virginia. Both TPI and Pine Run are wholly-owned subsidiaries of Marina Development, Inc. Marina, in turn, is owned by Arthur Steckler.

Sometime in either 1988 or 1989, Aetna Life Insurance Company made TPI and CFC a $22,500,000 loan relating to the power projects. On January 15, 1996, that loan was restructured and the parties entered into a Revised Loan Agreement. Under the 1996 Revised Loan Agreement, TPI and CFC exchanged the original notes and the original loan was broken into two separate notes—"A Notes" with a face value of $6,700,000, and "B Notes" totaling $15,800,000. The Revised Loan Agreement also provided TPI and CFC with a limited right of first refusal should Aetna seek to sell either the A Notes or the B Notes.

Simultaneous with the Revised Loan Agreement, the parties entered into an Amended and Restated Collateral Trust Indenture, and a formal Management Agreement. Under the Management Agreement, the parties agreed that Algonquin would assume operational responsibility for the hydroelectric plants. The Trust Indenture named State Street Bank as security trustee, among other things.[2]

In November of 1996, Algonquin offered to purchase the B Notes from Aetna for $94,000.[3] Pursuant to the Revised Loan Agreement, Aetna subsequently notified TPI and CFC of the purchase offer. By formal notice to Aetna dated December 17, 1996, TPI and CFC exercised their limited right of first refusal to purchase the B Notes for 105% of Algonquin's purchase offer. Additionally, TPI and CFC gave Aetna a $50,000 deposit towards the purchase of the B Notes, and named February 11, 1997, as the date that the remaining balance would be paid. However, TPI and CFC failed to tender the remaining $48,700 to Aetna on February 11, 1997. Rather, TPI and CFC delivered the balance due on the B Notes to Aetna on February 17, 1997, six days after the original due date named by TPI and CFC. Aetna rejected the $48,700 as untimely, refused to sell TPI and CFC the B Notes, and eventually sold the B Notes to Algonquin.

---

1. CFC is now apparently defunct.

2. Under the above agreements, payment to the various parties was structured as follows: Niagara Mohawk, buying power generated from the plants, would make monthly payments to State Street Bank as security trustee under the Trust Indenture. State Street Bank would then make monthly payments on the A and B Notes to Aetna, and payments to Algon- quin for its management fee. TPI was paid a monthly amount for auditing expenses.

3. Aetna was apparently willing to sell the B Notes, which had a face value of over $15 million, for only $94,000 because it had little expectation of receiving full payment on the loan.

In September of 1997, Algonquin offered to purchase the A Notes from Aetna for the lesser amount of either $5,900,000 or the outstanding principal of the notes. Aetna again notified TPI and CFC of the purchase offer. TPI and CFC apparently did not respond to the notice of the proposed sale, and Aetna and Algonquin reached an agreement for the transfer of the A Notes to Algonquin. The sale of the A Notes was consummated in December of 1997.[4]

On July 1, 1999, TPI and CFC received a notice of intent to levy based on unpaid taxes from the Internal Revenue Service. Based upon that notice of intent to levy, Algonquin, as holder of the B Notes, declared TPI and CFC in default of the revised loan agreement on August 5, 1999, and accelerated the amount due under the notes. The IRS subsequently issued the notice of levy on August 20, 1999. Algonquin, who continues to operate and control the power plants, thereafter directed payment of the tax amount due.

On August 6, 1999, TPI and CFC commenced a breach of contract action against Algonquin and Aetna (99–CV–1238), and that action is still pending before this court. In 99–CV–1238, TPI and CFC claim that Aetna improperly transferred both the A Notes and B Notes to Algonquin. Algonquin's counterclaims in 99–CV–1238 seek a declaration that it is the rightful owner of the notes and money damages stemming from TPI's alleged breach of the Trust Indenture with respect to the B Notes.

As referred to above, TPI was awarded the principal sum of $7.6 million in its professional malpractice action against the engineers and architects of the power plants. An appeal bond in the amount of $8,436,250 was issued by American Casualty Company of Reading, Pennsylvania.[5] On December 22, 1999, during the pendency of the appeal of the malpractice action, TPI filed with the court an assignment of the $7.6 million judgment to Pine Run, reciting as consideration for the transfer "Five ($5.00) Dollars and other good and valuable consideration" (Complaint, Docket No. 1, Exh B). After learning of the assignment and the fact that Arthur Steckler owned both TPI and Pine Run, Algonquin filed 00–CV–1246, claiming that TPI was attempting to frustrate any potential judgment by Algonquin on its counterclaims in 99–CV–1238. Specifically, Algonquin asserts that the assignment is an unlawful conversion based upon language contained in the Trust Indenture and, further, that the assignment violates sections 273 and 276 of New York Debtor and Creditor Law.[6] Additionally, Algonquin seeks attorneys' fees pursuant to Debtor and Creditor Law § 276–a.

Algonquin's motion for an order of attachment and/or a preliminary injunction in 00–CV–1246 is based on its belief that if the assignment of the judgment is not frozen until a resolution of the claims and

---

4. The debt on the A Notes was effectively satisfied as of July 2000.

5. The Second Circuit recently affirmed the judgment awarded to TPI, and remanded the case to the trial court for imposition of prejudgment interest. *See Trafalgar Power Inc. v. Neal Dunlevy & Stetson–Harza Corp.*, 227 F.3d 8 (2d Cir.2000), *aff'g in part, vacating and remanding in part* 63 F.Supp.2d 225 (N.D.N.Y.1999). Additionally, it is noted that American Casualty Company of Reading, Pennsylvania was named as a defendant in 00–CV–1246 because, as holder of the appeal bond, any decision on the validity of the assignment necessarily involves it.

6. Section 273 provides: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation incurred without a fair consideration." N.Y. Debtor and Creditor Law § 273 (McKinney 1990).

Section 276 provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debtor and Creditor Law § 276 (McKinney 1990)

counterclaims in 99–CV–1238, TPI will not have sufficient assets to satisfy any judgment Algonquin might realize in that action. In support of their cross motion to dismiss, TPI, CFC and Pine Run contend that 00–CV–1246 needlessly complicates 99–CV–1238.

## DISCUSSION

Even though the Magistrate Judge ordered 00–CV–1246 consolidated with 99–CV–1238 under Fed.R.Civ.P. 42(a), the actions do not lose their separate identities. *See Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 497, 53 S.Ct. 721, 728, 77 L.Ed. 1331 (1933) (Consolidation "does not merge suits into a single cause, or change the rights of parties, or make those who are parties in one suit parties in another."); *Cole v. Schenley Indus. Inc.*, 563 F.2d 35, 38 (2d Cir.1977) ("Consolidation under Rule 42(a) is a procedural device designed to promote judicial economy, and consolidation cannot effect a merger of the actions or the defenses of the separate parties. It does not change the rights of the parties in the separate suits."). With this is mind, the court turns to the provisional relief Algonquin seeks in 00–CV–1246.

### 1. Order of Attachment

■ New York Law governs any order of attachment issued by this court. *See* Fed.R.Civ.P. 64; *Bank Leumi Trust Co. of New York v. Istim, Inc.*, 892 F.Supp. 478, 481 (S.D.N.Y.1995). To obtain an order of attachment under New York law, a moving party must demonstrate through affidavit or other written evidence (1) that a cause of action for a money judgment exists, (2) a probability of success on the merits, (3) the existence of one or more grounds enumerated in section 6201 of the CPLR, and (4) that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. *See* CPLR §§ 6201; 6212(a); *Bank Leumi Trust Co.*, 892 F.Supp. at 481; *see also, Ford Motor Credit Co. v. Hickey Ford Sales, Inc.*, 62

N.Y.2d 291, 301–302, 476 N.Y.S.2d 791, 795, 465 N.E.2d 330 (1984).

Applying the above elements, the Magistrate Judge first determines that Algonquin sufficiently demonstrates that a cause of action exists. In making that determination, the Magistrate Judge looks to Algonquin's counterclaims in 99–CV–1238 rather than examining the causes of action pleaded in 00–CV–1246, the action wherein Algonquin seeks the provisional relief. The Report states in relevant part:

> In its counterclaims in 99–CV–1238, Algonquin seeks to collect the principal and interest due on the B Notes issued by TPI. *It is in aid of this remedy that Algonquin claims it is entitled to attachment of the $7.6 million dollar judgment* . . . .
>
> . . . . .
>
> Neither party disputes, and I so find, that if the circumstances as plaintiff presents them were found to be true, then *plaintiff has at the very least stated a cognizable claim for collection on the B Notes.*

(Report, Recommendation and Order (11–8–00), Docket No. 39, at 19–20) (emphasis added) (footnote omitted). In their objections to the Report, however, the TPI defendants do not specifically dispute this conclusion

The Report next evaluates whether Algonquin proves a probability of success on the merits. In analyzing this element, the Magistrate Judge again fails to examine the underlying causes of action in 00–CV–1246, i.e., Algonquin's probability of success on the merits of its claim for conversion and violations of article 10 of the Debtor and Creditor Law resulting from the TPI to Pine Run assignment. Rather, the Report analyzes Algonquin's probability of success on the merits of its counterclaims for TPI and CFC's alleged default on the B Notes in 99–CV–1238. The Report states:

> Analysis of the probability of Algonquin's success on its underlying claims

requires review of the chain offered by Algonquin to support its position. The first link in that chain involves Algonquin's claim that it properly holds the B Notes given by TPI, a contention which is sharply disputed. If Algonquin is the lawful holder of the notes, then Algonquin's position on the merits also depends upon whether it properly accelerated payment on the notes based upon TPI's alleged default—another issue controverted by TPI. This is true since otherwise, there is no evidence that TPI is in arrears in making payments under those notes, and consequently Algonquin would not be entitled to any monetary judgment on its counterclaims in 99–CV–1238—the lynchpin of its request for attachment. If either of those links is fatally weak, then Algonquin cannot demonstrate the requisite probability of success on the underlying merits

(*id.* at 20–21). The Report ultimately concludes that "Algonquin has demonstrated a probability of success in showing that it properly accelerated the principal and interest due on the B Notes, and therefore will likely prevail on its counterclaims in the 99–CV–1238 action for the amount owed by TPI" (*id.* at 28).

The TPI defendants object to the Magistrate Judge's finding "that Algonquin has demonstrated a probability of success on the merits as to its rightful ownership of the Notes" (TPI Defts' Rule 72.1 Objections to the Magistrate's Report, Docket No. 41, at 2–3); and also to the Magistrate Judge's conclusion that Algonquin will likely succeed on its claim that it properly accelerated the principal and interest due on the B Notes and thus succeed on its counterclaims in 99–CV–1238 (*see id.*, at 10).

Algonquin objects to the portion of the Report wherein the Magistrate Judge concludes that the additional reasons Algonquin advances to justify the acceleration of the loan—that the assignment of the $7.6 million judgment violated paragraphs 8.6, 8.9 and 8.10 of the Trust Indenture—are

irrelevant to the instant motion because neither of those events compelled Algonquin to accelerate the amount due on the Notes (*see* Pl's Objections to Report, Recommendation and Order, Docket No. 40, at 3–5). In response to these objections, the court examines the Magistrate Judge's above conclusions *de novo.*

It is clear that the Magistrate Judge, and to a certain extent the parties, believe that the success of Algonquin's motion for an order of attachment and/or a preliminary injunction in 00–CV–1246 turns on whether Algonquin will ultimately succeed on its counterclaims in 99–CV–1238 and, thus, become a judgment creditor as to TPI. This belief is erroneous. Algonquin moved for provisional relief in 00–CV–1246, and the proper analysis of whether it should be afforded that relief involves an examination of its underlying claims for conversion and violations of article 10 of the Debtor and Creditor Law. As a threshold matter, the court will briefly explain why Algonquin's success on its counterclaims in 99–CV–1238 is irrelevant to the relief sought in the instant motion.

■ Under article 10 of New York's Debtor and Creditor Law, "a [c]reditor is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." Debtor and Creditor Law § 270. Relevant here, a "contingent" claim is one which has not accrued and which is dependent on some future event that may never happen. *See Shelly v. Doe,* 173 Misc.2d 200, 660 N.Y.S.2d 937 (1997), *aff'd as modified* 249 A.D.2d 756, 671 N.Y.S.2d 803 (3d Dep't 1998). Putting aside the issue of whether Algonquin has a security interest in TPI's $7.6 million judgment under the Trust Indenture, Algonquin's pending counterclaims against TPI in 99–CV–1238 are clearly "contingent" claims. The very existence of those counterclaims establishes Algonquin as a creditor under the Debtor and Creditor Law.

■ Moreover, Algonquin may properly maintain a separate action attacking the TPI to Pine Run assignment as a fraudulent conveyance under article 10 of the Debtor and Creditor Law *without* alleging the elements of its counterclaims in 99–CV–1238. In *Herring–Curtiss, Co. v. Curtiss,* 140 Misc. 857, 252 N.Y.S. 106 (1931), the plaintiffs brought a separate second action alleging that the defendant's deceased husband and the defendant herself made certain fraudulent transfers in violation of article 10 of the Debtor and Creditor Law. *Id.* Although the court granted defendant's motion to dismiss the claim on other grounds, it stated:

> The plaintiffs show that they have a claim, which they are seeking to reduce to judgment. They need not allege the elements of that claim in this action. A reference to a prior action to establish their claim, which constitutes a record of this court is sufficient. There is nothing in the statute requiring one suit to be brought for both causes of action.

*Id.* at 857, 252 N.Y.S. at 108. The court continued, stating that where the action establishing the claim has already been brought and is then followed by fraudulent conveyances, a second action may be commenced to set the fraudulent conveyance aside. *Id.* at 858, 252 N.Y.S. at 108. The court wrote:

> The creditor need not wait until his claim has been reduced to final judgment, but may proceed to protect himself against any action by the defendant seeking to make his judgment a nullity. A second action may proceed as far as the court deems proper. Relief, pending the determination of a cause of action, is common in provisional remedies. The court may choose to go no further, until judgment in the first action, than to restrain the defendant from disposing of the property alleged to be fraudulently conveyed . . . .

*Id.,* 252 N.Y.S. at 108.

In sum, because Algonquin is entitled to maintain a separate action for alleged violations of article 10 of the Debtor and Creditor Law, its motion for an order of attachment only involves an examination of its claims in 00–CV–1246. Therefore, the court briefly examines Algonquin's claim for conversion and its claims of violations of sections 273 and 276 of the Debtor and Creditor Laws to conclude whether it should be afforded that provisional relief.

■ First, it is important to note that, upon a proper showing, an order of attachment may be issued based on Algonquin's cause of action for conversion, *see AMF Inc. v. Algo Distributors, Ltd.,* 48 A.D.2d 352, 369 N.Y.S.2d 460, 464 (1975). And although Algonquin satisfies the first element for an order of attachment, i.e., that a claim for a money judgment exists, Algonquin cannot at this time demonstrate a probability of success on the merits.

■■ To establish a cause of action for conversion under New York law, a plaintiff must (1) demonstrate legal ownership or an immediate superior right of possession to specific money; and (2) show the defendant exercised unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights. *See AMF Inc.,* 369 N.Y.S.2d at 464. Algonquin contends that it has a superior right of possession to specific money because the Trust Indenture grants it a security interest in TPI's $7.6 million judgment. This contention lacks merit. Even assuming that Algonquin properly owns the B Notes, it cannot demonstrate a superior right of possession to TPI's tort judgment. It is undisputed that the Trust Indenture does not specifically identify TPI's $7.6 million judgment even though the parties knew of the judgment when entering into that agreement. More importantly, article 9 of the Uniform Commercial Code specifically exempts the transfer of a tort claim from security interests. *See* Conn. Gen.Stat. § 42a–9–104(k) ("[t]his article does not apply . . . to a transfer in whole or in part of any claim

arising out of tort").[7] Algonquin cannot show an immediate right of possession to TPI's tort judgment and, thus, fails to show a probability of success on the merits of its conversion claim.

 Whether Algonquin's section 273 and 276 claims independently support an order of attachment under CPLR § 6201 at this stage in the litigation is doubtful. That section states in relevant part that "[a]n order of attachment may be granted . . . where the plaintiff has demanded and would be entitled . . . to a *money judgment* against one or more defendants." CPLR § 6201 (McKinney 1990) (emphasis added). Here, Algonquin does not seek a money judgment as relief on its Debtor and Creditor Law causes of action.[8] Rather, it only seeks a judgment declaring void and setting aside the conveyance of the $7.6 million judgment from TPI to Pine Run (*see* Complaint, Wherefore Cl., Docket No. 1, at 12–13). Because Algonquin has not demanded a money judgment and only seeks equitable relief on its section 273 and section 276 causes of action, an order of attachment is not warranted on its unmatured claims.[9] *But cf. Mishkin v. Kenney & Branisel, Inc.,* 609 F.Supp. 1254, 1256–57 (S.D.N.Y.1985) (granting order of attachment without any specific discussion of the plaintiff's twelve causes of action which apparently sought to void various transactions made by the defendants), *aff'd,* 779 F.2d 35 (2d Cir.1985) (unpublished table decision).

In light of the court's *de novo* determination that Algonquin cannot show a probability of success on the merits of its con-

version claim, and that its section 273 and 276 claims do not support an order of attachment under CPLR § 6201 at this time, it is unnecessary to review the Magistrate Judge's additional findings with respect to the remaining elements necessary for that provisional relief.

### 2. Preliminary Injunction

 In order to obtain a preliminary injunction, a party must establish irreparable harm and either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits, with a balance of hardships tipping in favor of the party requesting the preliminary injunction. *See Tunick v. Safir,* 228 F.3d 135, 139 (2d Cir.2000).

In the Report, the Magistrate Judge determines a threshold issue exists as to whether "a court sitting in equity can aid a potential judgment creditor in preserving assets to be later used to satisfy a money judgment based upon a claim for breach of contract" (*see* Report, Recommendation and Order (11–8–00), Docket No. 39, at 39–40). After thoroughly analyzing and distinguishing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), as well as *ContiChem LPG v. Parsons Shipping Co., Ltd.,* 229 F.3d 426 (2d Cir.2000), the Magistrate Judge concludes that the court is empowered to grant such injunctive relief. Relying on *Grupo Mexicano,* the TPI defendants object to the portion of the Report finding that injunctive relief is available to Algonquin to protect any interest it may have in the judg-

---

7. The parties' agreements are governed by Connecticut state law.

8. Had Algonquin moved for an order of attachment based on its counterclaims in 99–CV–1238, this threshold problem would not exist because its counterclaims in that action demand a money judgment.

9. It is clear that a creditor whose claim has *matured* is entitled under Debtor and Creditor Law § 278 to attach or levy execution on property fraudulently conveyed. Algonquin,

however, does not have a matured claim against TPI and Pine Run. *See Shelly v. Doe,* 173 Misc.2d 200, 660 N.Y.S.2d at 940 ("[a] claim is said to have matured—a term used in the substantively identical definitions of creditor and debt under the DCL—when it 'has become absolutely due without contingency, although not necessarily liquidated or presently payable.'") (citation omitted). TPI's debt to Algonquin is premised upon Algonquin's success in 99–CV–1238 and, thus, Algonquin has an unmatured claim against TPI.

ment should it prevail on its counterclaims against TPI.

 Examining this issue *de novo*, the court concludes that *Grupo Mexicano* and *ContiChem* are easily distinguishable from these facts. While those cases stand for the proposition that a district court has no authority to issue a preliminary injunction freezing a debtor's assets pending adjudication of an action *solely* at law, Algonquin claims here mainly seek equitable relief. As is clear by now, the thrust of 00–CV–1246 attacks the alleged fraudulent conveyance of TPI's tort judgment to Pine Run. Among other things, section 279 of the Debtor and Creditor Law permits a court to "[r]estrain the defendant from disposing of his property." N.Y. Debtor and Creditor Law § 279 (McKinney 1990).[10] Algonquin's request for preliminary injunctive relief is thus rooted in the ultimate equitable relief to which it is entitled under Debtor and Creditor Law § 279 should it prevail on its section 273 or 276 claims. Accordingly, upon a proper showing, the court is empowered to grant such preliminary relief under Fed.R.Civ.P. 65. *See De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945) ("[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."); *United States ex rel. Rahman v. Oncology Assoc. P.C.*, 198 F.3d 489, 496 (4th Cir. 1999) ("when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant, or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate and the prelimi-

nary relief furthers the court's ability to grant the final relief requested."); *see also Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 87 (2d Cir.1996) (affirming the district court's order granting preliminary injunction based on plaintiff's section 273 and 276 claims).

### A. Irreparable Harm

The Magistrate Judge concludes that Algonquin makes a sufficient showing of irreparable harm necessary to sustain a preliminary injunction. The TPI defendants dispute this conclusion, arguing that irreparable harm is not present where a plaintiff merely has a claim for money damages. The TPI defendants' arguments are misplaced, however, inasmuch as they focus on Algonquin's counterclaims in 99–CV–1238 and ignore the main relief Algonquin seeks in 00–CV–1246—to set aside the allegedly fraudulent conveyance. Algonquin will clearly suffer irreparable harm here because the potential relief it seeks may well be a nullity if Pine Run is assigned the $7.6 million judgment. Additionally, Algonquin establishes a likelihood of irreparable harm by demonstrating TPI's intent to frustrate any potential collection on the counterclaims in 99–CV–1238. *See Pashaian*, 88 F.3d at 85, 87 (irreparable harm requirement satisfied where actions taken by defendant was designed to frustrate a judgment)

### B. Likelihood of Success on the Merits Debtor and Creditor Law § 276 Claim

With respect to the next necessary element, the Report determines that Algonquin adequately demonstrates a likelihood of success on its section 276 claim. Sec-

---

10. Section 279 of the Debtor and Creditor Law specifically provides for the rights of creditors whose claims have not yet matured. That section states:

[w]here a conveyance made or obligation incurred is fraudulent as to a creditor whose claim has not yet matured [,] he may proceed in a court of competent jurisdiction against any person against whom he could

have proceeded had his claim matured, and the court may (a) *[r]estrain the defendant from disposing of his property*, (b) [a]ppoint a receiver to take charge of the property, (c) [s]et aside the conveyance or annul the obligation, or (d) [m]ake any order which the circumstances of the case may require.

Debtor and Creditor Law § 279 (emphasis added).

tion 276 provides that a conveyance is fraudulent if it was made with actual intent to hinder, delay or defraud a present or future creditor. *See* N.Y. Debtor and Creditor Law § 276 (McKinney 1990). In concluding that Algonquin sufficiently establishes that TPI likely acted with actual intent to hinder, delay or defraud it, the Magistrate Judge relies on "badges of fraud" to establish an inference of TPI's fraudulent intent. The TPI defendants object to this finding, contending that Algonquin fails to make the necessary showing of TPI's intent.

■ Factors that are considered "badges of fraud" are (1) a close relationship between the parties to the transaction, (2) a secret or hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance. *See MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 934 (S.D.N.Y.1995).

Looking *de novo* at this portion of the Report, the court agrees that Algonquin establishes a likelihood of success on the merits of its section 276 claim. Algonquin alleges that the TPI to Pine Run assignment was made with actual intent to defraud it as a creditor. Specifically, Algonquin asserts that Pine Run is a shell corporation owned by Arthur Steckler, the same owner of TPI, and that he will maintain control over the $7.6 million judgment. Algonquin claims that inadequate consideration supports the assignment, and that TPI made the assignment

with knowledge of Algonquin's counterclaims against it in 99–CV–1238.

■ TPI counters that the assignment to Pine Run was repayment of prior loans from Pine Run to TPI, and was recorded on TPI's and Pine Run's books as an intercompany loan. An antecedent debt can constitute fair consideration for purposes of determining whether a conveyance is fraudulent. *See American Inv. Bank, N.A. v. Marine Midland Bank, N.A.,* 191 A.D.2d 690, 595 N.Y.S.2d 537, 538–539 (2d Dep't 1993); Debtor and Creditor § 272.[11]

TPI, however, does not proffer *any* record evidence of this antecedent debt. Without any credible record evidence to establish this antecedent debt, the assignment of a $7.6 million judgment for $5.00 does not constitute fair or adequate consideration and certainly supports an inference of TPI's fraudulent intent. *Cf. U.S. v. Hansel,* 999 F.Supp. 694, 700 (N.D.N.Y. 1998) (holding that under section 272 of the Debtor and Creditor Law, the defendant failed to establish transfer was for fair consideration where the defendant claimed that a transfer of 25 shares of stock was in repayment of a debt, but then offered no evidence of the debt.).

■ In addition, Algonquin successfully establishes other "badges of fraud" to support the inference of TPI's fraudulent intent—namely the close relationship with TPI and Pine Run; TPI's knowledge of the pending counterclaims; Steckler's control over the judgment; and, although not secret or hasty, a transfer out of the ordinary course of business. Thus, the court agrees with the Magistrate Judge's conclusion that Algonquin adequately demonstrates a likelihood of success on its section 276 claim, and that Algonquin is

---

11. "Fair consideration" under the Debtor and Creditor Law is given for property or an obligation

a. When exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Debtor and Creditor Law § 272 (McKinney 1990).

entitled to a preliminary injunction freezing the $7.6 million judgment *pendente lite*.

### Debtor and Creditor Law § 273 Claim and Conversion Claim.

The Report also concludes that Algonquin does not show a likelihood of success on its section 273 claim and claim for conversion. The Magistrate Judge determines that success on Algonquin's section 273 is not likely because it fails to show that TPI's assignment to Pine Run would render TPI insolvent—a necessary element for a section 273 claim. Likewise, the Magistrate Judge determines that Algonquin's conversion claim will likely be unsuccessful because it cannot demonstrate a sufficient security interest in TPI's tort judgment. Algonquin objects to these portions of the Report, first arguing that TPI failed to establish its solvency after the assignment of the judgment.

 Debtor and Creditor Law § 273 provides that a conveyance made without fair consideration is fraudulent as to creditors if the transferor is or will be rendered insolvent. *See Shelly v. Doe*, 671 N.Y.S.2d, at 805. When a transfer has been made without adequate consideration, only the *initial* burden to establish solvency is on the transferor. *Id.* TPI met that burden here by submitting summary appraisal reports for the various power plants which state that those plants have a fair market value of $29,150,000.00 (*see* Yesawich Affid, Docket No. 13, Exhs. A–F). Despite Algonquin's contention that the Yesawich affidavit lacks a factual basis,

the submitted appraisal reports adequately establish TPI's solvency because the value of the plants submitted by TPI would satisfy any potential judgment by Algonquin on its counterclaims in 99–CV–1238. Algonquin's own submissions, which place the value of the power plants much lower, fail to sufficiently establish that TPI is rendered insolvent by the TPI to Pine Run assignment. Algonquin thereby does not establish a likelihood of success on its section 273 claim.

Algonquin also contends that the Magistrate Judge errs in concluding that it is unlikely to succeed on its conversion claim. Algonquin claims it has a security interest in the tort judgment, and that TPI breached the Trust Indenture agreement because it agreed not to (1) transfer any of its property, (2) enter into any transaction with an affiliate, and (3) incur or have outstanding indebtedness. This argument is unpersuasive. As already discussed above, Algonquin cannot show an immediate superior right of possession in the TPI's tort judgment and, as a result, does not demonstrate a likelihood of success on the merits of its conversion claim.[12]

### 3. Undertaking

Lastly, the Magistrate Judge recommends that Algonquin post a $2 million undertaking to protect TPI and Pine Run against the loss of use of the $7.6 million judgment. With interest added, that judgment is expected to be worth approximately $11,000,000 in January 2001. In fixing the amount of the undertaking, the Report states, "I am assuming that with unfet-

---

12. After finding that Algonquin establishes the right to have both an order of attachment or a preliminary injunction, the Magistrate Judge concludes that a preliminary injunction is the proper provisional relief and recommends denying Algonquin an order of attachment. Algonquin objects to this portion of the report, arguing that it should receive both. However, because this court does find Algonquin is entitled to an order of attachment, it will not disturb the Magistrate Judge's recommendation of the same.

Additionally, as a proposed intervenor, Aetna submits two objections to the Report. Both objections seek to clarify certain time periods with respect to when Aetna and Algonquin reached agreements for the sale of the A Notes and B Notes respectively. Putting aside the issue of whether Aetna has standing to object to the Report inasmuch as its motion to intervene was denied by the Magistrate Judge, the court notes that the time frame of the sale of the Notes is not relevant to the disposition of these instant motions.

tered access to the judgment proceeds Pine Run could exceed the post judgment interest figure of 4.732% by approximately nine percent (9%), and that with due diligence the parties should be able to have this matter fully litigated to resolution within a period of two years." (Report, Recommendation and Order (11–8–00), Docket No. 39, at 63). Algonquin objects to the amount of the undertaking, arguing that the interest rate should be nine percent (9%) as set forth in CPLR § 5004, minus the earned rate of 4.732%. Using this formula on the tort judgment, Algonquin fixes the amount of the undertaking at \$469,480.00 the first year, and \$1,003,428.99 for the second year. Additionally, Algonquin contends that it should only be required to post an undertaking for the first year and, assuming the matter is not resolved by that time, the court can then revisit the issue.

After considering the issue *de novo,* the court accepts the Magistrate Judge's recommendation for a \$2 million undertaking. The \$2 million will adequately compensate the TPI defendants if it is later found that they were wrongfully deprived of the use of the tort judgment for that period of time, and it is reasonable to expect the litigation to be resolved two years from now.

## CONCLUSION

After carefully considering the Magistrate Judge's Report, the parties' objections, and the record in this matter, the court ADOPTS the Magistrate Judge's recommendations, albeit for different reasons than those contained in his Report. Accordingly, (1) Defendants' cross motion to dismiss is DENIED; (2) Plaintiff's motion for an order of attachment is DENIED; and (3) Plaintiff's motion for a preliminary injunction precluding TPI from assigning or otherwise disbursing the tort judgment pending the determination of this action is GRANTED. Plaintiffs are directed to post a security in the amount of \$2 million. The parties are directed to

submit proposed orders consistent with this decision within 20 days.

IT IS SO ORDERED.